Sandford, J.,
in respect of these two instruments of evidence, ruled as follows ; 1. In reference to the competency of John Young as a witness. The plaintiff claims that he has already established by evidence in Baker’s possession, which would be conclusive against Young, that if there were a partnership between them in 1828 and 1829, it was one by which Baker was to receive half the profits, and was entitled to a return of his whole capital advanced, without any diminution, however disastrous the business may have proved.
If the question were open, I should say, as Bronson, J., did in Pierce v. Kearney, that it would be difficult to reject this witness on the ground of interest in favor of the plaintiff. The debt was fixed upon Young by the judgment; and if by this suit, the plaintiff should collect the same debt out of the defendants, (which is the same thing as collecting it from Baker;) the latter, on the theory upon which the plaintiff seeks to charge him in respect of the -nature of his interest in Young’s opera *11 tions, would be entitled in equity, to enforce the original judgment against Young. And the defendants, as Baker’s sureties, would have the same equity as their principal was entitled to, on their advancing for him the amount of the judgment. But I am not at liberty to follow out this argument. The decisions of the supreme court in Marquand v. Webb, (16 Johns. 89,) and Pierce v. Kearney, (5 Hill, 82,) are conclusive in my view of the case ; and the deposition of Young must be excluded.(a)
2. Accompanying this deposition, is a manuscript proved to be in the handwriting of Young, and apparently a letter press copy2 entitled “ Result of Operations in 1832and crediting Mr. Baker in conclusion for half the balance thereby struck, being the precise sum which it appears by his accounts, he charged to Young for half of the profits resulting from certain operations made on account of both. The entry in Baker’s accounts is at the close of 1832 ; and the paper offered in evidence bears date at Trinidad de Cuba, 31st December, 1832, and is signed by Young. The testimony shows that this document was delivered by Young to the plaintiff’s attorney, when the judgment was confessed, in October, 1834. Aside from the evidence of Young, which is excluded, the plaintiff relied upon the coincidence between the balance on the manuscript, and that contained in Baker’s accounts, as establishing its authenticity beyond a doubt. It was said, that Young could not have fabricated it in 1834, in this city, when all his books and papers were in the bankrupt court in Cuba; and that if such a contrivance had been resorted to, the account for 1828 or 1829 would have been selected, instead of that of 1832, which was three years after the plaintiff’s dealings with Young.
The great difficulty in the way of admitting the testimony, is that there is no proof that the document was in existence in 1832. Under the circumstances of this case, I do not feel warranted in holding from the date of the instrument, that it was made at that time. Without this presumption in its favor, the *12 coincidence in the amount of the balance credited to Baker, is of little moment. It was an easy matter to make a statement and force a balance of any given sum; and the paper may have been made after Young’s failure, prior to his visit to this country in 1834. It is not necessary to impute any fabrication or fraud to Young. I may even believe, as an individual acting daily on what the law rejects as hearsay evidence, that the document is all that it purports to be; but as a judge, who must reject all testimony not legally competent, I cannot shut my eyes to the consideration, that there is great and obvious liability to fraud, in a document like this. 1 think that it cannot be received as evidence in the cause.
The plaintiff then gave in evidence, a translation of portions of the tenth chapter of the Ordinances of Bilbao, promulgated by the King of Spain in 1737; and of sundry articles of* the Code of Commerce, promulgated by like authority in May, 1839 ; and that the latter applied to all the Spanish dominions. The former prescribed, that all partnerships should be formed by a public instrument before a notary, specifying the terms agreed upon, as well as the capital and term of the co-partnership.
The Code of Commerce contained similar provisions, and article 28 declared that an instrument of partnership not registered, should be of no effect between the parties to demand any rights under the same, without rendering it ineffectual in favor of third parties interested. It ordained three kinds of partnership ; the collective being similar to our general partnership in the liabilities incurred.
The plaintiff then proved by his attorney in the suit against Young and Baker, that Young was in the city of New York in 1834, and was served with the capias issued in that suit. Being cross-examined, he said that the cognovit was signed in his office by Young, after the witness exhibited the plaintiff’s accounts current to Young. He did not know that a judgment was to be given, till Young came to his office. He was expected to arrive here, and witness had been instructed to sue him when *13 he came. After he arrived, witness was informed he alleged Baker had been a partner, and the plaintiff instructed him to proceed against both Youug and Baker. Before that, Young had commenced two suits against the plaintiff, both in 1831. One was in assumpsit, in which judgment went against Young for not going to trial. The other was for a malicious prosecution in relation to a foreign attachment by the plaintiff. This suit was ended by a non pros for not declaring.
The plaintiff then read in evidence the petition and affidavits on which the attachment issued against Baker and Young, on which the bond in suit was given. The petition stated, that Baker resided in Cuba, and Young in Mexico, against whom the plaintiff had a demand for $22,492 89, arising upon a judgment rendered in the supreme court against Young and Baker in favor of the plaintiff. The affidavit set forth, that B. and Y. were justly indebted to the plaintiff in the sum above stated, arising upon a certain judgment rendered in the supreme court against Baker and Young, in favor of the plaintiff.
The plaintiff then rested his cause.
The defendants counsel moved for a nonsuit, on several grounds, which are noticed in the judge’s decision at the trial. The motion for a nonsuit was denied.
The defendants read in evidence the depositions of three witnesses, taken at Trinidad de Cuba, tending to show that there was no partnership between Baker and Young; and called as a witness the liquidator in bankruptcy in Cuba of John Young’s accounts, who testified to the entries in his books, and in respect of his letters and papers, which it was insisted, showed there was no such partnership.
Similar evidence was given by another witness who made up the accounts furnished by Baker to Young, and stated that they were made up from detailed accounts rendered by Young to Baker. Also, that Baker, not considering that those detailed accounts were of any consequence, or might be interesting at a future day, and having Young’s accounts to show the amount due, never preserved any of the detailed accounts.
The defendants then gave in evidence a stipulation, dated *14 February 19th, 1846, entitled in this suit, and signed by the plaintiff and by the attorneys for both parties, in these words :
“ The plaintiff having brought this cause on, ready for trial at the present February term of this court, under stipulation to try at said term, and the defendants having, at the commencement of said term, moved for a commission to examine a witness at Trinidad de Cuba, which motion has been granted, with a stay of proceedings till the return of said commission ; it is hereby agreed between the attorneys of the respective parties, that the plaintiff shall deduct from the amount of the judgment in his favor against Young and Baker, as of the time of its confession, on the assessment of damages, under the breaches assigned, the sum of nine thousand six hundred and eighty-seven dollars and fifty-nine cents, but without prejudice to his claim on the judgment in any other suit; and that the defendants waive the order for the said commission; that the defendants shall not give any evidence on the trial to show any error or alleged fraud on the part of the plaintiff, in stating an account and taking said judgment, so far as respects the allowance or disallowance of any sum or sums, item or items, in respect to the seizure, condemnation, redemption or restoration, of the ship Marmiozi or her cargo, on her second voyage to Trinidad de Cuba, in 1828, it being understood, that said deduction is not to be applied to any other items ; that this stipulation is made by way of compromise, for the purpose of avoiding expense and delay, and is not to affect or prejudice either party in respect to the question of copartnership, or the correctness or incorrectness, or bona Jides or malafides of the liquidation of the account and confession of judgment by Young ; and that this stipulation, as to deduction, shall not bind the plaintiff if the defendants shall further postpone the trial of this cause beyond the first week in March term, 1846 ; and the plaintiff hereby stipulates to bring said cause to trial at the said March term.”
The defendants counsel then called a witness, and proposed to go into proof touching the seizure and condemnation of the *15 Marmion and her cargo, on her second voyage in 1828; and that the balance of account claimed by the plaintiff in 1834, and recovered by him in the judgment against Young and Baker, included the Marmion and her cargo on that voyage. The plaintiff’s counsel objected to any inquiry relating to the Marmion or her cargo, as a violation of the stipulation above set forth; and the counsel for the defendant yielded the point.
The plaintiff’s counsel also admitted, that this cause was tried in the first week of March term, 1846, and a verdict was found for the defendants, which was set aside for errors of the judge on the trial; and the counsel for the defendants admitted that a new trial having been ordered, the defendants in March term, 1847, moved to put off the. trial, on the ground of the absence of a material witness, which motion was opposed, on the ground that it involved a violation of the stipulation of the 19th of February, 1846, but was granted; and at April term again postponed the trial till May term, on the same ground. That after the order to postpone, the witness appeared on the same day, whereupon the plaintiff moved to restore the cause to the calendar, and try it at that term; that the defendants opposed the motion, on the ground of wanting time to translate the documents which the witness brought with him from Trinidad, and the motion was denied ; that in May term, 1847, the cause was passed without the fault of either party; that in June term, 1847, the cause was again tried; that the jury did not agree: that in July term, 1847, the trial was again postponed by defendants, on the ground of the sickness of one of their counsel, and the refusal of the other counsel, who had assisted on a former trial, to try it alone, after an unsuccessful motion to obtain a commission to examine John W. Baker, at Trinidad, to prove the destruction of the detailed accounts.
The testimony here closed on both sides, and the counsel for the defendants requested the judge to rule,
1st. That the record of the j udgment referred to in the declaration in this cause, was not competent evidence.
2d. That the plaintiff had not proved such a demand against *16 Baker as was claimed by the plaintiff in his petition for the attachment upon rvhich the bond in' suit was executed.
3d. That the evidence showed that there was no jurisdiction in the officer who issued the attachment, and that therefore, the bond was void.
4th. That the evidence showed collusion between Young and Oakley in the confession of the judgment, which was therefore void as against Baker.
5th. That the statute relative to joint debtors, was never intended to give any effect to a judgment by confession against the individual property of a party not served with process ; and the attachment against Young and Baker, so far. as it related to the individual property of Baker, was unauthorised by law, and void, and that therefore, the bond of defendants was void.
6th. That the evidence did not establish a partnership between Young and Baker.
7th. That if the plaintiff were entitled to recover any thing in this suit, the deduction provided for in the stipulation of the 19th of February, 1846, must be made ; and that the plaintiff was not entitled to recover for the cargo of the Marmion, seized and confiscated by the Spanish authorities.
Sandford, J.,
on giving judgment, delivered the following opinion and decision:
Several of the points, relied upon as entitling the defendants to judgment, were embraced in their motion for a nonsuit. Thus, 1. It was contended that the plaintiff had not proved all the averments in his declaration. One of the most important, said to be defectively proved, was the existence of such a demand against Baker, as was claimed by the plaintiff in his petition for the attachment, upon which the bond in suit was executed.
In that petition, the plaintiff alleged that he had a demand against Baker and Young for $22,492 89, arising upon a judgment, rendered in the supreme court of this state, against them in. favor of the plaintiff; The judgment produced in evidence *17 appears to have been rendered against them as joint debtors, Young alone having been served with process.
This, it is insisted, does not prove such a demand against Baker, as is stated in the petition for the attachment, and recited in the bond; and that the supplementary testimony, introduced to establish Baker’s liability for the debt upon which the judgment was entered, is inadmissible to sustain the averment in the declaration now under consideration.
As to the latter point, the defendants are undoubtedly correct, in holding that the plaintiff cannot recover on this bond, on the mere proof of an open demand upon contract against Young and Baker, or against Baker only. But I think they err in their view of the effect of the judgment recovered. Our statute declares, that in an action against joint debtors, where the process has been served upon one or more of the defendants, but not upon all, the judgment, if rendered in favor of the plaintiff, shall he against all the defendants, in the same manner as if all had been served with process. (2 R. S. 377, § 1.) The effect of the judgment is ihen regulated, of which I will speak presently.
One consequence of the recovery of such a judgment, most clearly is to merge and extinguish the original debt upon which the suit is brought. If all the defendants had been served with process, the judgment would indisputably merge the debt. The statute says the judgment, in a case like this, shall be rendered against all, in the same manner as if all had been served. It cannot be so rendered, if as against some of the debtors, the original demand is open and subsisting, while against others it is extinguished. It is well settled, that the plaintiff in a suit upon such a judgment, must declare in debt upon the judgment, and cannot declare upon his original cause of action. (Townsend v. Carman, 6 Cow. 695; S. C. in error, 6 Wend. 206; Mervin v. Kumbel, 23 Wend. 293.) The revised statutes, in providing that in a suit upon the judgment it shall only be evidence of the extent of the liability of those not served with process, after their liability had been established by other proof, merely enacted what had been settled law, under the provisions *18 of the revised laws of 1813. (See the opinions delivered in Townsend v. Carman, before cited.) And the case of Mervin v. Kumbel, in which Judge Bronson expressed his doubts as to bringing a suit upon the judgment, is an authority that such a suit may be brought, and it moreover shows that no injustice can arise from proceeding on the judgment, because the defendant who was not served with process, may, by the simple. plea of mil tiel record, compel the plaintiff to prove his original liability.
Therefore, in 1837, when the plaintiff applied for an attachment against Baker, his demand against Baker and Young, (if he ever had any,) was a judgment against them. He could not legally describe it as any thing but a judgment. If he had claimed for a balance due to him on consignments, the production of this record of judgment would have been a conclusive answer to his claim, and avoided his proceedings.
But it was urged, conceding that the judgment merged the debt, that Baker was thereby discharged to all intents, unless in a suit directly upon the judgment itself. In other words, that for the purposes of a proceeding under the act relative to non-resident debtors, the plaintiff had no demand against Baker. His debt was merged in the judgment, and the judgment was unavailable to him for any purpose, except for an execution against joint property, and for a suit directly upon it.
The same course of argument was presented to the court of last resort in Carman v. Townsend, and was rejected as unsound. It is sufficient for me to say, that in accordance with the spirit of the decisions on the statute relative to joint debtors, the plaintiff has a demand resting in judgment against Baker as well as against Young, upon which he may proceed as a judgment, for any of the remedies which our laws give to creditors, with the qualification, that he must prove the original, indebtedness against Baker, if its existence be traversed by him, or in his behalf. And further, that the plaintiff cannot proceed upon his demand, otherwise than as a judgment. If the plaintiff therefore prove that he had a debt against Baker and Young, such as his judgment included, he will sustain the *19 averment in his declaration, that the sum claimed in his petition was due to him on a judgment in his favor against Baker and Young.
2. It was further objected, that the plaintiff had failed to prove jurisdiction in the officer who issued the attachment, and that therefore the bond was void, and the defendants are not liable.
Without adverting to the objection made upon the pleadings to the defendants raising this question, I will consider it as if it were unequivocally presented. The point is, that the plaintiff had no demand against Baker, upon which, as the law was in 1837, he1 could obtain an attachment against Baker’s property. The statute gives the remedy to any creditor “ having a demand against the non-resident debtor personally, whether liquidated or not, arising upon contract, or upon a judgment rendered within this state,” &c. (2 R. S. 3, § 3.) It is argued, that the plaintiff’s judgment is not a demand against Baker personally, because it can be enforced by execution only against the joint property of Young and Baker.
The word personally was used in this act to distinguish from demands which were against debtors in a representative capacity, as executors and administrators. (In the matter of Hurd, 9 Wend. 465.) It has no reference to the state or condition of the demand itself; that is, whether it be a debt due or to become due, in simple contract, in bond, or in judgment. And it is impossible for me to perceive why a demand on a judgment, which by means of a suit and appropriate evidence, may be enforced against the individual property of the debtor, is not as much a demand against him personally, as one upon his bond or promissory note.
The affidavit upon which the attachment issued, in my view, therefore, set forth the plaintiff’s demand correctly, both in form and in fact, and it is unnecessary for me to examine the case of Kanouse v. Dormedy, decided in the court for the correction of errors, in December last,(a) which was cited to show *20 that the defendants, in a suit upon the bond, could not inquire into the jurisdiction of the officer who issued the attachment.
3. Another ground, arising upon the merits of the case, was urged in support of the motion for a nonsuit. The judgment in question was entered upon a confession signed by Young, after-the suit was commenced by the issuing and service of a capias ad respondendum. It appeared in evidence, that, in 1831, Young refused to settle, and even to examine the accounts with the plaintiff’s agent, who went to Cuba for the purpose, and he commenced two suits here against the plaintiff, one in assumpsit, and the other for a malicious prosecution, founded on the plaintiff’s having proceeded against him as an absent debtor. Then, in 1834, on his arriving here, and being sued by the plaintiff, he at once confessed judgment for the balance claimed.
On the other hand, it is to be observed that the seizure and confiscation of the Marmion on the second consignment made to Young, was the occasion of great difficulty and embarrassment to him, and of a heavy loss to be borne either by him or the plaintiff. In the balance claimed by the latter, this loss was cast upon Young ; and there is no reason to doubt that the serious question between them, in respect of this loss, was the cause of the refusal of Young to settle with the plaintiff’s agent in 1831, and of the suits commenced by him in that year. Those suits were driven out of court, for want of prosecution, in October, 1833. The testimony of A. Y. Piaster, the supercargo, established, at least presumptively, the existence of the plaintiff’s demand against Young, to the extent of the balance for which the judgment was confessed, including the Marmion’s second cargo. The stipulation between the parties precludes the defendants from objecting to the fairness of the judgment, on account of the amount included for that cargo.
The defendants insisted that the circumstances in evidence proved collusion between Young and Oakley, in the confession of the judgment, and that the statute relative to joint debtors, was never intended to give any effect to a judgment by confession, against the individual property of a party not served with process.
*21 My opinion is clear, that there is not sufficient evidence in the case to warrant me in believing that there was any collusion in the confession of the judgment. As to the point of law, the statute is not restricted to any particular mode of recovery. It does not require that the suit shall have been contested by the party who was served with process. And I have no right in construing it, to say that a judgment by nil dicit is within its spirit and intent, and that a judgment by cognovit actionem, is not.
If Young and Baker were really partners, (which the plain tiff must prove, to maintain this suit.) Young, in 1834, had undoubted authority to settle the partnership accounts with the plaintiff, and strike a balance. (Bridge v. Gray, 14 Pick. 55.) And it was obviously indifferent to Baker, whether after Young settled the balance, he should suffer judgment by default, and have that balance proved before a sheriff’s jury, or should sign a confession for the amount. The case of Pardee v. Haynes, (10 Wend. 630,) and the opinion of the court in Crane v. French, (1 Ibid. 311,) fully sustain my conclusion as to the validity of the judgment.
The great question in the cause remains; Was Mr. Baker liable as a joint contractor with Young for the plaintiff’s debt ? By the law of this state, and, as I understand it, by the law merchant recognized- and acted upon throughout the commercial world, a participation in the uncertain profits of trade, renders one a copartner in respect of the liabilities of the concern to third persons. And when money is advanced to a merchant, and the premium or profit for its use is not fixed and certain, but is dependent upon the accidents of trade, the person making the advance will be liable, as a partner, to such merchant’s creditors, although he is not to risk any part of his advance, or share in the losses of the trade.
There are exceptions to this rule in many countries, but they are to be found in the enactments of statutes and codes. Such are the special or limited partnerships in this state, the partnership en commandite and anonymous, allowed by the Code of Commerce in France, and the similar special partnerships, en la *22 commandita and anonymous, for which provision is made in the Codigo de Commercio of Spain. In respect of these limited partnerships, the laws of the countries authorizing them, require the observance of certain forms and acts of publication and registry, to make them complete. The Spanish code requires similar acts in the formation of general partnerships. It does not, however, appear, by the testimony before me, that there was any law in force in Cuba, requiring the observance of these acts, when the partnership is alleged to have been entered into between Baker and Young; or until May, 1829, when the Codigo de Commercio was promulgated, in Spain. The Ordinanzas de Bilbao, ordained in 1737, so far as the fact is proved, were local in their operation; and I have no historical information that they extended beyond the province of Biscay, and the adjacent regions of Old Castile and New Leon.
If it had been shown that the laws of Cuba in 1828, were the same as they appear to have been after May, 1829, it would not have affected the question in issue. A violation of the regulations prescribed, would have been visited upon the offending partners, and not upon merchants trading with them. Thus, by the 28th article of the Codigo, if the partners neglect to register the instrument of partnership, it shall be of no effect between the parties thereto, to demand any rights under it; but it shall not thereby be rendered ineffectual in favor of third parties, who may have contracted with the partnerships. (The same rule prevails in France. Code of Commerce, Art. 39 to 44.) So in our special partnerships, the failure to comply with the statutes, instead of absolving the special partner, renders him liable, as a general partner, for the engagements of the house.
In Shaw v. Harvey, (1 M. & Malk. 526,) two persons were the petitioning creditors in a bankrupt proceeding, alleging themselves to be partners in trade at Rotterdam, in the kingdom of Holland. The point became material on the trial; and, in answer to the proof of partnership given by the plaintiff, the defendants proposed to show that the petitioning creditors were not legally partners'according'to the laws of Holland, That *23 certain formalities in constituting a partnership, hy writing and registering the writings duly executed, were necessary; and that .these formalities were not complied with. A copy of the Code Napoleon, proved to be the law of Holland as to the Code of Commerce, was put in by "the defendants. Lord Tenterden, Chief Justice, after referring to the articles cited from the Code, said, this may be the governing law of Holland, but it will not prevent persons from suing here as partners. If they really are such, they may maintain an action for goods sold and delivered here. These are merely municipal regulations, preventing, as it seems, their suing as partners where they are in force, but not affecting the general rights of the parties.
Such being the law, the liability of Mr. Baker does not depend upon proof of the formation of a registered partnership, or of any written instrument. If the plaintiff has shown by the evidence, that Baker participated in the profits of the commission business conducted by Young, at the city and port of Trinidad de Cuba, when Young received the plaintiff’s consignments, the law merchant fixes upon him the liability of a partner, in respect of those consignments. The case is then narrowed to the simple question, whether Mr. Baker did or did not participate in those profits at the time designated 7 This, of course, must be determined by the evidence.
It appears that, prior to 1828, Young was transacting business as a commission merchant at Casilda, the port of Trinidad de Cuba, and also in the city of Trinidad, and he had had dealings of various kinds with Mr. Baker, by means of which .he was Baker’s debtor in the sum of $1,336 2|-, at the close of the year 1827. One of these transactions was a speculation in a cargo of boards, for which Baker advanced over $3,000 to Young in April, 1827, and he was credited in December with $492 3|-, half the profits on the adventure.
In January,- 1828, Young became the partner of Hector Kennedy, in the same commercial business. Mr. Baker furnished $5000 to Kennedy, which was entered by him in his accounts as a loan to K., and constituting K.’s capital. The balance due from Young, formed a part of this $5000. Kennedy died in *24 April, or early in May, 1828; but, in the meantime, Baber’s accounts with Kennedy and Young had so far extended, that there was a balance due to him. of $12,384 3, including the loan for K.’s capital. With a trifling exception, the charges against the firm were for sugar and molasses furnished by Baker.
Young continued the business in his own name from Kennedy’s death until his failure in the fall of 1833. The first consignment of the plaintiff was made in February, 1828, and nearly the whole cargo remained in Young’s hands after the death of Kennedy. The second cargo was consigned to Young in May, 1828, the third at the close of the year, and the last in the spring of 1829.
After Kennedy’s death, besides the usual business of a commission merchant, Young was engaged in various subsidiary and collateral adventures in shipments and merchandize, and in two speculations in real estate. Mr. Baker continued to advance to Young large sums in money, and valuable invoices of property. He appears to have been a man of very extensive means, and enjoying a high pecuniary as well as personal reputation. During the era of the plaintiff’s shipments, he was in habits of close business intimacy with Young, visiting Young’s counting-room very often, examining his books, and advising about his affairs, and Young was often at Mr. Baker’s house.
From the accounts produced by Baker, it appears, that as often as once a year, Young rendered to him detailed accounts of transactions between them. The accounts produced, made up by Baker against Young, contain charges for the moneys advanced, and the property delivered by Baker to Young, and sundry small items of debit, and charges for the gains on several adventures, which are designated; and in every instance, down to the close of the year 1832, there is at the end of each periodical account, a charge slightly varying in its phraseology in different years, but substantially in these words :
“To one half of the profits coming" to me from certain transactions in which Young interested me, the net proceeds amounting to $-(the sum stated,) and referring, in several *25 instances) to a liquidation or detailed account of the same, furnished to him by Young. The sums charged to Young for these profits, range from $2,015 5-L to $2,344 4, in the five periodical balances to which my observation applies.
A series of balance sheets, or summaries of accounts, rendered by Young to Baker, corresponding with those entered by Baker, for each stated period, to the close of 1831, were produced by Baker, under the orders for discovery. The subsequent account rendered for 1832, was not produced. To the credit of Young in these accounts current, appear the supplies of various kinds for Mr¡ Baker’s plantation, and other matters of private account, as well as moneys paid and other charges.
Among the designated adventures, for the profits on which Young was charged in Baker’s accounts, after May, 1828, were a cargo of boards per brig Angela, on which Baker’s share of the net proceeds was $1,682 4-|-; and the cargo of the schooner Good Intent, his share being $3,456 3J; both in 1831. And Young was credited- in January, 1829, with $4,020 4, for his share of the proceeds of the cargo of molasses and sugar sent to New York by the ship Marmion, there having been charged to him in account under a prior date, the invoice price of thy molasses and sugar, and the expenses on shipping the same.
In 1833, after Baker announced his intention to withdraw his funds at the end of the year, a special shipment appears to have been conducted by Young, but in Baker’s name throughout, for which Young is credited in account.
In all these accounts, there is no charge made for interest on the heavy advances of Mr. Baker; and the only apparent return made or expected for the use of his funds, is in the profits entered to his credit or for his benefit.
The plaintiff insists that the entries on balancing these accounts, charging Young with profits, are evidence under the circumstances that Baker participated in the profits of Young’s general mercantile' business. On the other hand, it is urged that the entries refer to insulated speculations or adventures, such as the cargoes of boards ; and that the severe, and in Cuba, the penal consequences of a secret partnership, ought *26 not to be visited on Mr. Baker, upon such slight testimony as this.
The burthen of proof is upon the plaintiff, and he should beheld to more ample testimony, for the reason that in these consignments which he made, he gave credit to Young alone. Having this in view, horv does the evidence stand ?
Here are entries made by Mr. Baker himself, showing a regular interest in the profits of certain transactions of Young, continuing for a period of five years. During all that time, Young’s regular business was that of a commission merchant. There is no evidence that he was engaged in other transactions to any considerable extent, save those designated in the accounts produced. Indeed, I do not remember but one, (independent of his house in town, and his purchase of land from Mr. Baker, at Casilda,) which is not specially entered, and the profits charged in Mr. Baker’s accounts. During the whole period, Baker was advancing money and valuable plantation produce to Young, without any charge for interest, and he was advising him in business, a frequent inmate of his counting-room, and frequently inspecting his books of account. What were these “ certain transactions” of Young, from which Baker was deriving a constant profit, unless they were his mercantile transactions 1 If they were not, was it not incumbent on Baker to have proved the fact by the production of Young’s detailed accounts furnished to him; or by the books of Young containing all his business operations ? Baker was apprised as long ago as 1837, that this plaintiff was attempting to charge him as the secret partner of Young. His letters in 1833, to which I will presently refer, show that he understood perfectly well, that the books and papers of Young would be resorted to for proof of this partnership ; and this assurance was made doubly sure by the plaintiff’s applications in this suit for a discovery of the accounts and correspondence in Baker’s possession. Why then did he not produce-Young’s books and detailed accounts, to explain the hidden meaning of the entries of the profits in his own accounts ?
It is answered, that the detailed accounts were destroyed *27 after Baker had established his demand in the bankrupt court at Trinidad. The reason assigned is, that he no longer considered them of any consequence. The documents before me show that Mr. Baker is a man of business, of abundant intelligence, very exact and methodical in his transactions; and it is difficult to avoid an unfavorable inference from an act so unusual as the destruction of the accounts rendered of extensive operations of a mercantile character, within a year after they closed. (1 Greenleaf Ev., § 37.) But where are the books of Young? The testimony shows, that on his failure, all his books and papers were seized, and remained from thenceforth in the custody of the court of bankruptcy. They are at Mr, Baker’s place of residence, and he might, by a commission, or otherv/ise, have produced on the trial, conclusive evidence from those books and papers, showing to what transactions Young’s detailed accounts crediting him with these -profits, actually referred.
It is said, that a resort to these documents was equally open to the plaintiff, and his possession of some original letters of Baker to Young, shows that he might have produced more testimony of the same character, if it would have answered his purpose.
To this it may be answered, that the production of two or three letters, is not any warrant for me to believe that the plaintiff could have abstracted from the files of the bankrupt court, in Cuba, all the documents that he thought proper. Nor is it so clear, that a resident of New York can obtain evidence from the records of a civil law tribunal under the Spanish gov- . ernment, to use against a Spaniard, resident at the place where they are kept, with the same facility, that the latter might obtain it if he thought proper. But it is sufficient to say, that the plaintiff, after proving the entries under consideration, had ' a right to rely on the inferences which result from them, and to call on the adverse party to rebut those inferences, if the facts would enable him to overcome their force. (See Whitney v. Sterling, 14 Johns. 215; 1 Greenleaf Ev. § 78 to 80; Thommon v. Kalbach, 12 Serg. & R. 238.)
*28 Has Mr. Baker produced evidence which repels the inference drawn from the entries in his accounts ? or has he explained those entries satisfactorily % Instead of exhibiting to the court Young’s books and papers, he has called three witnesses, residents of Trinidad, and two of them intimate with Young, who testify in effect, that they knew nothing of any partnership between Young and Baker. This testimony, wholly negative in its character, is not such as the case demanded.from Baker, and is of very little weight. When the witnesses testified so positively, that no person was interested with Young in his business, or in business transactions with him after Kennedy’s death, they proved at least that they really knew very little about the affairs of Young; for, Baker’s frequent interest in large special transactions of Young, is not merely unquestioned, but is made the basis of the defendant’s explanation of the entry of profits, &t the end of each balance-sheet of Baker’s accounts.
The testimony of Mr. De Zaldo is equally indecisive; we have here, all that he is positive that he compared or examined in the bankrupt proceedings.
The desperate circumstances of Young, and the improbability that Baker would involve himself as a partner with a bankrupt merchant, violate the laws, and incur a heavy penalty to the government, were presented to my consideration with great force.
As to the violation of the law, it is of such daily occurrence in the pursuits of men greedy for gain, that it furnishes but a slight presumption in opposition to facts, and the legitimate inferences from them. The penalty, like many in our own laws, may have been obsolete, and, in practice never enforced. And Baker, if he sought to share in the profits of Young’s business, calculated to conceal his interest as well from the espionage of the government, as from the more keen and rigid scrutiny of those who might become creditors of the concern.
It is not clearly proved that Young was insolvent in 1828. The expression in his letter, on which the defendants rely, taken with his expectation of a surplus, if he were allowed to *29 wind up his own affairs, is susceptible of a different construction. His meaning may have been, that he had always been embarrassed, and never able to meet his engagements as they matured. But if he were literally bankrupt in 1828, it does not relieve the case as to Mr. Baker. He was Baker’s debtor in $12,384 3, on the 14th of May, 1828, and after being charged with about $11,000 of profits on those “ certain transactions,” which are involved in so much obscurity, the balance against him was only $12,436 l-¡- on the 31st day of December, 1832, This shows a strong and manifest motive, influencing Baker in May, 1828, not merely to sustain Young in business for the purpose of obtaining payment of his large indebtedness, but relying on his commercial talents and his integrity and good faith, secretly to share with him the profits of all or portions of his business.
On the part of the plaintiff, there is other testimony strongly corroborating the inference he claims from the charge made by Baker for half the profits of “ certain transactions.”
Of this description is the entry in Mr. Baker’s accounts, at the foot of the balance sheet of Kennedy & Young. Baker there says he has agreed with Young to leave $5000 of the balance then due to him, in Young’s hands for two or three years, or as long as convenient, on condition that it should be invested only in transactions which B. should approve; that B. was to have access to his books whenever he pleased; and, in the event of any embarrassment in Young’s individual affairs, he should secure Baker in due season, for all the funds of his, then in Y.’s hands, so that B. should not suffer loss.
This entry contained every element of an agreement to furnish capital, with a participation in the profits, and without any risk of loss, except the expression of the division of profits. And this element was proved to have existed by the actual division of profits made every year, in the form heretofore stated. Such is the argument of the plaintiff, and it is one to which, on the testimony in the case, I can find no satisfactory answer.
The next entry of cash to Young?s debit, of any magnitude, *30 is $2970, on the 31st of March, 1829, “ delivered to him to be invested in certain transactions which offered profit.” This, certainly, looks like a further advance of capital on the terms, and for the purposes stated in the entry,, upon, which I have just commented, with the addition of a direct avowal of the intended participation in the offered profits. All the other entries of cash or bills of exchange advanced, which are contained in the accounts, appear to have been met, after short intervals, until 1833, by corresponding credits, either in large items of merchandize, or in money or bills returned, and they assume the character of temporary loans; thus strongly contrasting with the two charges of $5000 and $2970, respectively. This is another forcible corroboration of the argument, that those sums were the capital which Baker advanced to be invested in business which offered profit.
Further proof is furnished by Mr. Baker’s letters. These reflect light upon the acts of the parties in 1828 and 1829, as Avell as subsequently, for the books show that there was no intervening charge. In one, dated January 29, 1833, in which he comments upon Young’s account rendered for 1832, he insists on being credited for the price of the lots in Casilda, Avhich was not yet due, and requests Young to make a sequel of the account current “with the introduction of the items omitted that may correspond to me (him) for- the transactions of the year.” He adds; he “ would prefer our closing all our accounts at the end of this year,” On the 2d of November, 1833, Young Avrote to Baker respecting his difficulties, and urging an extension of time from his creditors. This letter undoubtedly treats Baker as a creditor, and all the accounts show he Avas suoh a creditor to a large amount. But it is in perfect harmony with the conclusion that he had been interested in the profits of Young’s house, though not liable for losses.
In his answer to this letter, or a similar one, in which Y. proposed to give him some security, Baker, on the 30th of November, suspending his decision as to Young’s proposal, made use of some remarkable expressions. He said,—“ Should any *31 thing appear on your books relative to a note at the foot of your account current, in case your creditors present themselves against you, any security in my favor Would not, ¡in my opinion, be valid. You can, however, should this ¡be not the case, secure me on your house in town, arid in any other manner you think best, the amount you may suppose, from my observations, may be due to me.” . The'only note at the foot of Young’s accounts, to which this letter could have referred, is the one showing the terms upon which the ^5000 was left with Young, in May, 1828.
A note without date, but evidently following the one of 30th November, is still plainer in its import. Mr. Baker says—■“ On reflection, would advise that oar accounts be made out without •any mention of transactions, as I am certain, in the event of your securing me, it will be demanded by the creditor's and, after his signature, he added—“Your books may probably express my having had interest in your transactions.” •
It is scarcely possible to account for all this solicitude as to the contents of Young’s books, and the desire to avoid affording to Young’s creditors any clue to a knowledge of those entries, on the supposition that Baker’s interest in his affairs had been limited to a few occasional speculations in specific and distinct transactions. It is the natural language of a man, who was conscious that he had incurred a serious legal liability, by his implication in the affairs of a failing house; and who was attempting to forestall the means by which that liability might be established against him. "
I have now brought together the leading circumstances and arguments, bearing upon the great point of the case. I have considered them with the care and deliberation due to the importance of the cause, and with no little anxiety, on account of the peculiar maimer in which it has become my duty to decide on the facts in issue.
The absence of proof by Mr. Baker of the true meaning of the statedly recurring entries of the profits made by Young, on transactions not designated, when it is so apparent that such proof was in his power, has borne upon my mind with great *32 force. And, connecting those entries, and the want of evidence in explanation of their meaning, with the other entries upon which I have commented, the situation and conduct of the parties, and the letters of Baker to Young, I cannot resist the conclusion, that during the whole period, from the death of Kennedy to the failure of Young, Mr. Baker participated in the profits of the commercial house of Young. And while this rendered him liable as a partner to the commercial creditors of Young, I am equally clear, that, as between himself and Young, he was to have all his capital restored to him, without any diminution by the losses of the concern;
The plaintiff having established the joint indebtedness of Baker and Young, for which the judgment was recovered in 1834, the statute fixes the amount of the liability. It is neither more nor less, prima fade, than the amount of the judgment. (2 R. S. 377, § 1; Mervin v. Kumbel, 23 Wend. 293.)
A serious question then arises upon the stipulation entered into between the parties on thé 19th of February, 1846. The plaintiff to prevent delay, and both parties to avoid expense, agreed, the one to deduct the disputed amount growing out of the seizure of the Marmion’s cargo, in May, 1828, and the other to give no evidence on the subject to affect the judgment. It was further agreed, that the plaintiff should not be bound to deduct that sum, if the defendants should further postpone the trial of the cause beyond the first week in March term, 1846. The cause was tried in that week, and a verdict rendered for the defendants, which was afterwards set aside. The defendants, on two occasions since, have further postponed the trial.
By the literal terms of the stipulation, the plaintiff is not bound to make the deduction. I have doubts as to the true intents of the instrument, and as the case will unquestionably come before the whole court for review, I deem it best, without committing myself to any conclusion on the point, to hold it at this time with the plaintiff. If that be the true construction, no further trial will be requisite on this ground ; and if the sum ought to be deducted, it can be done on disposing of the motion for a new trial.
F. B. Cutting, and J. P. Hall, for the defendants.
H. P. Hastings, and J. A. Spencer, for the plaintiff.
The sum due on the judgment recovered in 1834, exceeds the penalty of the defendants bond. My judgment will therefore be entered in the usual form, for the penalty, $44,985 78.
The defendants made a case, and moved for a new trial.
By the Court. Vanderpoel, J.
This is a motion for a new trial, as against the finding of Judge Sandford, before whom, by consent of the parties, this cause was tried without a jury.
The eightieth section of the act of 1847, in relation to the judiciary, (Laws of 1847, p. 345,) provides that, where a cause shall be on the calendar of any court for the trial of any issue or issues of fact, the issue or issues may, by consent of all the parties in the cause, be tried by the judge or officer holding the court, without a jury, and the finding of such judge or officer, on such issue or issues of fact, shall, in all respects, have the same effect as the verdict of a jury thereon, and no other; and the court or judge shall decide all questions of law arising on the trial of the issues, in the same manner as though such cause was tried by a jury.
The finding of the judge who tried the cause here, is, therefore, to have the same effect as the verdict of a jury; and we are, in reviewing it, to deal with it as we would with a verdict. If the judge has erroneously decided questions of law, our duty is clear ; the cause, in that event, must be sent back for a new trial; but when he has dealt with facts, we should not, and will not, interfere with his finding, as contrary to evidence, unless there be a decided preponderance against such finding. The same rules of law that would guide us in reviewing the verdict of a jury, in respect to the weight of evidence, control us in looking at the finding of the judge, in regard to questions of fact, when he sits in the place of a jury. We do not mean to *34 intimate, that we do not fully acquiesce in the conclusions of fact to which the learned judge arrived; but if, sitting in his place, the majority of the court would have come to a different conclusion, it by no means follows, that we would, therefore, feel warranted in reversing the finding of the judge at the trial. It is entitled to just the same degree or measure of exemption from our interference, as the law awards to the verdict of a jury.(a)
When the testimony closed, the counsel for the defendants requested the judge to rule several propositions. These requests must be regarded in the same light as requests to charge, where a cause is tried by a jury.
(The judge here repeated the several points as inserted, ante, pp. 15 and 16.)
We are unanimous in the opinion, that the response of the judge to the first five propositions or requests to rule, was correct. He ruled contrary to what he was requested to do, as to each of these five propositions ; and his reasons for so ruling are very fully and clearly stated in his opinion, appended to the case. I cannot add to the force of the reasoning of that opinion, and am, therefore, content to let our entire concurrence in the conclusions of the judge upon these points, find its vindication and support in the views which he has deliberately, and so ably written out. I will not hazard the vain effort of adding to the force of those views.
The counsel for the defendants also, moved for a nonsuit, on most of the grounds above stated. This motion was properly overruled. This necessarily follows, if the same points taken and repeated after the testimony closed, were unsound. After carefully looking at all the cases, as well those referred to in the opinion of the judge who tried the cause, as those cited by the counsel, we perceive no reason for differing from the judge’s conclusion.
The great and main question in the cause is, Were Baker *35 and Young partners, so as to make them liable as joint contractors for the plaintiff’s debt? The judge at the trial has found, that they were such partners, and has very fully commented on the evidence which has brought his mind to this conclusion. We have carefully considered the evidence, to which the judge adverts in support of his finding, and think it is strong enough to justify his conclusion. I do not feel called upon here, to dissect or review this evidence, after the very full exposition of it by the judge in his opinion. Suffice it to say, that we concur in the conclusion of the judge, as to this great and principal question in the cause. But if the majority of the court, sitting in the place of that judge, would have come to a different conclusion, we would not and could not, as before suggested, when reviewing this finding, lose sight of the fact, that we were dealing with what is equivalent to the verdict of a jury; and that such verdict must be manifestly and palpably against the weight of evidence, to authorize the granting a new trial on that ground. (Jackson v. Loomis, 12 Wend. 27.) So far from considering the verdict or finding here, as being against the weight of evidence, we consider it fairly warranted by the evidence. In support of this view, we deem it supererogatory to add any comments or illustrations to the able and elaborate reasoning of the judge who tried the cause.
The only remaining question, is one that arises on the stipulation between the parties, dated 19th of February, 1846. The plaintiff, to prevent delay, and both parties to avoid expense, agreed to deduct the disputed amount, growing out of the seizure of the Marmion’s cargo, in May, 1828, or at the time of the confession of the judgment, which amount was then $9,687 59. The defendants agreed not to give any evidence on the trial to show any error or alleged fraud on the part of the plaintiff, in stating an account and taking such judgment, so far as respects the allowance or disallowance of any sum or sums, item or items, in respect to the seizure, condemnation, redemption or restoration of the ship Marmion or her cargo, on her second voyage to Trinidad de Cuba, in 1828. It further provided, that the stipulation, as to deduction, should not bind the plaintiff, if *36 the defendants should further postpone the trial of this cause beyond the first week in March term, 1846 ; and the plaintiff stipulated to bring the cause to trial at the March term.
The cause was tried in the first week of that term, and a verdict was rendered for the defendants, who made a case, and moved to set aside the verdict and for a new trial, which was granted, several terms after the verdict was rendered. The plaintiff again noticed his cause for trial, and then, on motion of the defendants, the trial was postponed on two occasions.
The question is, is the plaintiff still bound to make duction ?
It is evident, that when the witnesses were examined in this cause, the counsel for the plaintiff supposed the stipulation was still in force. Mr. Pfister, the principal witness for the plaintiff, was asked by the counsel for the defendants, what was the exact amount of the balance, payment of which he demanded in behalf of the plaintiff. He answered, that it was the balance of all the accounts, including the Marmion and her cargo; and the counsel for the plaintiff objected to any inquiry, relating to the seizure of the Marmion or her cargo, as a violation of the stipulation of the 19th of February, 1846, and the counsel for the defendant yielded the point. The plaintiff, surely, could not keep part of the stipulation alive, (that part which makes in his favor,) and hold the residue not binding. It must stand or fall for the whole. Again, the counsel for the defendant asked the witness, Pfister, who seized the cargo of the Marmion. The counsel for the plaintiff objected to the question, as violating the stipulation, and the counsel for the defendants, disclaiming all intention to violate the stipulation, withdrew the question.
Now, it would be gross injustice to the defendants, after the plaintiff’s insisting upon the binding force of the stipulation on the trial, and after having had the full benefit of it, in the exclusion or withdrawance of testimony offered by the defendants, to hold that the defendants are to be cut off from all the benefits intended to be secured to them by the stipulation.
*37 We are, moreover, of the opinion that the counsel for the plaintiff was right on the trial, in supposing that the stipulation was not rendered defunct or nugatory by the postponements of the cause after the defendant had procured an order for a new trial. The manifest object of the plaintiff, in entering into the stipulation, was to procure a trial of this cause in the first week in March term, 1846. The defendants did not throw any obstruction in the way of procuring the cause to be then tried. It was tried, and here the defendants part of the stipulation, (the consideration for plaintiff’s entering into it,) was performed and executed, and he was absolutely entitled to the deduction provided for. The plaintiff’s claim was reduced pro tanto, the moment he attained his object, viz.: a trial in the first week of that March term. The application for postponement, after an order for a new trial was made, could not work a forfeiture of a right which the defendants had secured, by having fulfilled their part of the stipulation.
This conclusion is strengthened, when we consider that the defendants, according to the terms of the stipulation, had waived their order for a commission to examine further witnesses, and, for aught we know, may thereby have waived testimony, which would have precluded the court from granting a new trial. But we deem the necessity for holding valid the stipulation imperative, when we consider that the defendants, on he objection of the plaintiff, and in pursuance of the stipulation, forebore to give any evidence on the last trial, to show error or fraud in the judgment, so far as it relates to the Marmion and her cargo.
If the plaintiff should elect to deduct the sum of $9,687 59, from the amount of his judgment, as of the time provided for by the stipulation, the verdict or finding of the judge must stand for the residue of the judgment entered on confession. If he shall not, within twenty days, signify his consent or election in writing, to make such deduction, there must be an order for a new trial; the costs to abide the event of the suit.
*38 (The plaintiff made the deduction, and judgment was entered accordingly.)(a)

 See Hills v. Nash, before the Master of the Rolls, 11 London Jurist R. 741.

 Now reported in 3 Denio, 567.

 See Osborn v. Marquand, Vol. I., page 457, S. P.

 The defendants appealed to the court of appeals, where on deciding the cause, it appeared that four judges were in favor of sustaining the defendants motion for a nonsuit, on the ground that the plaintiff had not proved such a demand against Baker as was claimed and described in the plaintiff’s petition for the attachment, upon which the bond in suit was executed. That the plaintiff’s demand against Baker should have been described as being upon contract, and not upon a judgment; and should have set forth the original cause of action. Three judges held, that the decision of the superior court on this point, was correct, and one judge was absent. As the concurrence of five judges of the court of appeals is necessary to pronounce a judgment, (Amended Code of 1849, § 14,) the point appears to stand as the superior court decided it. One of the three judges who agreed with the latter court on this point, held that the plaintiff ought to have been nonsuited below, for the want of sufficient proof of a partnership between Young and Baker; and on this ground alone, voted with the four judges first mentioned, in favor of a reversal. No other judge concurred with him as to the nonsuit. See a history of the matter in the N. Y. Legal Observer, Vol. 8, p. 123.
And see note to this case in the index, under the title “Judgment and Execution.”